**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 17 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

SEQUOYAH COUNTY RURAL
WATER DISTRICT NO. 7, an agency
and legally constituted authority of the
State of Oklahoma,

        Plaintiff - Appellant,

v.

TOWN OF MULDROW, an Oklahoma
Town, and MULDROW PUBLIC
WORKS AUTHORITY, a public trust,

        Defendants - Appellees.

CITY OF BROKEN ARROW and
OKLAHOMA MUNICIPAL LEAGUE,
INC.,

        Amici Curiae.

No. 98-7090

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 97-CV-578-S)**

---

Michael D. Davis (Steven M. Harris with him on the briefs), Tulsa, Oklahoma, for
Plaintiff-Appellant.

Linda C. Martin (James C. Milton with her on the brief) of Doerner, Saunders,
Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for Defendants-Appellees.

Michael R. Vanderburg, City Attorney for the City of Broken Arrow, Broken

Arrow, Oklahoma, filed an amicus curiae brief for the City of Broken Arrow.

Diane Pedicord, Oklahoma City, Oklahoma, filed an amicus curiae brief for Oklahoma Municipal League, Inc.

—————————————

Before **PORFILIO**, **McKAY**, and **TACHA**, Circuit Judges.

—————————————

**McKAY**, Circuit Judge.

—————————————

Plaintiff-Appellant Sequoyah County Rural Water District No. 7 appeals the district court's entry of summary judgment in favor of Defendants-Appellees Town of Muldrow, Oklahoma, and Muldrow Public Works Authority, a public trust.[1] Plaintiff filed this action under 42 U.S.C. § 1983 claiming that, as a debtor of the Farmers Home Administration (FmHA),[2] it was entitled to the protection of 7 U.S.C. § 1926(b), namely, the exclusive right to provide water service within its

---

[1]Two amicus curiae briefs were submitted in this matter, one on behalf of the City of Broken Arrow and one on behalf of the Oklahoma Municipal League, Inc. Although we have considered the arguments presented by the amici curiae in our disposition of the issues raised by the parties, we decline to address their additional arguments. See Tyler v. City of Manhattan, 118 F.3d 1400, 1404 (10th Cir. 1997) (explaining that court should use its discretion to address additional arguments raised by amici curiae only in exceptional circumstances).

[2]Although the FmHA is now known as the Rural Utilities Service, see 7 C.F.R. § 1780.3(a), to avoid confusion we will refer only to the FmHA in this opinion.

service area.  Plaintiff alleged that Defendants deprived it of its § 1926(b) rights by providing water service to certain customers within Plaintiff's service area. Plaintiff also sought declaratory and injunctive relief to prevent Defendants from selling or continuing to sell water within its service area as well as damages for Defendants' past encroachments.[3]

## I.

Plaintiff is a rural water district incorporated by the Board of County Commissioners of Sequoyah County, Oklahoma, to develop and provide water service to the rural residents within its territory.  See OKLA. STAT. ANN. tit. 82, § 1324.3.  Plaintiff was initially established in October 1966 as Sequoyah County Rural Water District No. 4.  In 1969, Sequoya-4 was dissolved and all of its assets and liabilities were assigned to an entity called the Rural Water Corporation (RWC).  Finally, in March 1991, the Board of Commissioners transferred all of the assets and liabilities of RWC into Sequoyah County Rural Water District No. 7, which is Plaintiff's current name.

Oklahoma law authorizes rural water districts to borrow money from the

---

[3]Plaintiff also sought a constructive trust to remedy Defendants' alleged encroachments, but Defendants claim that Plaintiff has waived this issue on appeal by failing to raise it in its opening brief.  Regardless of whether Plaintiff has waived this issue on appeal, we leave the issue of what remedy is appropriate for the district court on remand.

federal government to accomplish the purposes for which they are established. See OKLA. STAT. ANN. tit. 82, § 1324.10.4. As part of the Consolidated Farm and Rural Development Act, 7 U.S.C. §§ 1921-2009n, Congress authorized the Secretary of Agriculture to make or insure loans to nonprofit water service associations for "the conservation, development, use, and control of water." 7 U.S.C. § 1926(a). In accordance with these provisions, RWC began borrowing funds from the FmHA in 1969 to build water service facilities. RWC eventually became indebted to the FmHA on three notes. The first note was dated April 14, 1969, and was in the amount of $384,000; the second was dated June 9, 1970, and was for $45,500; and the third, dated July 15, 1981, was for $388,000.

In 1989, RWC elected to repurchase its notes from the FmHA pursuant to a government debt buy-back program. See Omnibus Budget Reconciliation Act of 1986 [OBRA], Pub. L. No. 99-509, § 1001, 100 Stat. 1874 (1986), as amended by Agricultural Credit Act of 1987 [ACA], Pub. L. No. 100-233, § 803, 101 Stat. 1714 (1988) (codified at 7 U.S.C. § 1929a note). Accordingly, on May 5, 1989, RWC borrowed money from the National Bank for Cooperatives and purchased or paid off all of its then-outstanding indebtedness to the FmHA at a discounted rate. After the buy-back, each of the FmHA notes was marked "SATISFIED IN FULL—FmHA." Appellant's App., Vol. II at AP597, AP599. When RWC's assets and liabilities were transferred to Plaintiff in 1991, its obligations to the

Bank were included in the transfer. Plaintiff remains indebted to the Bank at this writing. On September 28, 1994, as Sequoyah-7, Plaintiff took out another FmHA loan in the amount of $331,400 to fund the construction of a project entitled "Redline." Plaintiff remains indebted to the FmHA on the 1994 loan.

We are concerned in this case with three periods of time during which Plaintiff alleges that it was indebted to the FmHA and during which Defendants allegedly began serving customers within Plaintiff's territory. The first relevant period of time is between April 14, 1969, the date on which RWC first became indebted to the FmHA, and May 5, 1989, the date on which RWC repurchased its loans from the FmHA. Sometime during this time period, Defendants began providing water service to two customers within Plaintiff's territory, the Gunter Ridge Addition and the Gold Crown Motel, which at the time was known as the Diana Motel.

Sometime between May 5, 1989, and September 28, 1994, the date on which Plaintiff obtained its final loan from the FmHA, Defendants began providing water service to the following additional customers within Plaintiff's territory:

(1)    Cherokee Rock Addition, Lots 2, 13, and 14

(2)    FWCC Trucking, location number 820138

(3)    J.D. Hill, location number 820127

(4)     Laster Realty Co., location number 839861

(5)     Rasamy Mangboupha, location number 820149

After September 28, 1994, Defendants began serving the following customers within Plaintiff's territory:

(1)     Cherokee Rock Phase I, Lots 1, 3-12

(2)     Food Plus/Dollar General Store, location number 816937

(3)     Bob Pruitt Property (John Bogner), location number 817806

(4)     FWCC Trucking Office, location number 819929

(5)     OK Industries (a/k/a OK Foods), location number 816893

(6)     J.D. Hill Truckwash, location number 820166

(7)     Doug Harvell, location number 820182

Both Plaintiff and Defendants filed motions for partial summary judgment, and Defendants filed a motion to dismiss Plaintiff's state law claims. In an Order dated June 12, 1998, the district court denied Plaintiff's motion for partial summary judgment, granted Defendants' motion for partial summary judgment, and dismissed Plaintiff's remaining claims.[4] The court first explained that to

---

[4]Because the parties had entered a stipulation of dismissal as to Plaintiff's state law claims prior to the court's disposition of the partial summary judgment motions, the court noted that Defendants' motion to dismiss was moot. See Appellant's App., Vol. III, Doc. 19 at AP951 n.2. The parties also entered a stipulation of dismissal with respect to Plaintiff's two antitrust claims prior to the court's summary judgment order. See id. Plaintiff has not raised these issues on
(continued...)

-6-

establish its entitlement to protection under § 1926(b), Plaintiff must prove that "(1) it is an 'association' within the meaning of the Act; (2) it has a continuing indebtedness to the FmHA; and (3) [Defendants have] encroached upon or invaded an area to which [Plaintiff] has 'made service available.'" Appellant's App., Vol. III, Doc. 19 at AP957 (citation omitted). Noting that Defendants did not contest Plaintiff's status as an "association," the court then held that, because Plaintiff repurchased its 1969, 1970, and 1981 notes from the FmHa on May 5, 1989, it was no longer indebted to the FmHA. Thus, the court found that, as of May 5, 1989, the protection afforded to Plaintiff by § 1926(b) was "extinguished and no action taken by [Defendants] prior to that time is actionable." Id. at AP960. The court then evaluated whether Plaintiff was entitled to relief for encroachments occurring after September 28, 1994, the date on which Plaintiff obtained a new loan from the FmHA. Because it was undisputed that Plaintiff was indebted to the FmHA after September 28, 1994, this determination turned on whether Defendants had "encroached upon or invaded an area to which Plaintiff ha[d] 'made service available.'" Id. at AP961. The court concluded that Plaintiff had not made service available to the disputed customers because it had no duty under state law to do so, see id., and because it either did not have sufficiently

---

[4](...continued)
appeal.

proximate facilities or sufficient capacity to serve the customers. See id. at AP964-65. Its conclusion was based in part on the fact that Plaintiff "would require customers[] who are already being adequately served by [Defendants][] to pay for improvements to [Plaintiff's] distribution system." Id.

## II.

We review the grant or denial of summary judgment de novo, and we apply the same legal standard employed by the district court pursuant to Federal Rule of Civil Procedure 56(c). See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.

Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995).

This court has stated that "Congress enacted 7 U.S.C. § 1926(b) as part of a federal statutory scheme to extend loans and grants to certain associations providing soil conservation practices, water service or management, waste

facilities, or essential community facilities to farmers, ranchers, and other rural residents." Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2, 861 F.2d 1211, 1214 (10th Cir. 1988). "The legislative history of section 1926(b) demonstrates that Congress intended to protect rural water districts from competition in order to encourage rural water development." City of Grand Junction v. Ute Water Conservancy Dist., 900 P.2d 81, 88 (Colo. 1995); see also S. REP. NO. 566 (1961), reprinted in 1961 U.S.C.C.A.N. 2243, 2309 (explaining that 7 U.S.C. § 1926(b) was enacted "to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system"). In addition, § 1926(b) was intended "to provide greater security for the federal loans made under the program." Bell Arthur Water Corp. v. Greenville Utils. Comm'n, 173 F.3d 517, 520 (4th Cir. 1999).

Section 1926(b) states in full:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b). This court has held that to receive the protection against competition provided by § 1926(b) a water association must (1) have a continuing indebtedness to the FmHA and (2) have provided or made available service to the disputed area. See Glenpool, 861 F.2d at 1214. The purpose of the second inquiry is to determine whether the disputed customers are within the water association's service area, i.e., "that area to which [Plaintiff] provided service or made service available." Bell Arthur, 173 F.3d at 525. Doubts about whether a water association is entitled to protection from competition under § 1926(b) should be resolved in favor of the FmHA-indebted party seeking protection for its territory. See North Alamo Water Supply Corp. v. City of San Juan, Tex., 90 F.3d 910, 913 (5th Cir. 1996) ("The service area of a federally indebted water association is sacrosanct. Every federal court to have interpreted § 1926(b) has concluded that the statute should be liberally interpreted to protect FmHA-indebted rural water associations from municipal encroachments."); see also Jennings Water, Inc. v. City of North Vernon, Ind., 895 F.2d 311, 315 (7th Cir. 1989) (listing five federal courts which have concluded that § 1926 should be liberally interpreted to protect FmHA-indebted rural water associations from municipal encroachment).

In this appeal, Plaintiff first argues that the district court erred in finding that, when Plaintiff repurchased its notes from the FmHA, it lost the protection to

which it was entitled under 7 U.S.C. § 1926(b). Plaintiff claims that it has been entitled to continued protection under § 1926(b) since 1969, when it first became indebted to the FmHA. Plaintiff also argues that all of the disputed customers are within its service area by virtue of both its legal duty to serve the customers and its capacity to serve the customers within a reasonable time after service is requested. At the very least, Plaintiff claims that genuine issues of material fact should have precluded summary judgment on the issue of whether it had or could provide sufficiently proximate and adequate facilities to serve the disputed customers within a reasonable time.

## A.

We begin our analysis with the continuing indebtedness prong of § 1926(b). Because there is no question that Plaintiff was indebted to the FmHA between April 14, 1969, and May 5, 1989, and that Plaintiff again became indebted to the FmHA after September 28, 1994,[5] the critical issue is the effect of Plaintiff's

_____

[5]Defendants argue that, because Plaintiff obtained its 1994 loan from the FmHA to finance a particular project, this indebtedness could not be used to obtain protection for other customers served by Defendants. We reject this argument for two reasons. First, even though the loan was used to fund a particular project, all of Plaintiff's territory was pledged as security for the loan. See Appellant's App., Vol. II, Doc. 12 at AP675-76. Second, we agree with the Bell Arthur court's recent conclusions that there is no statutory support for the "position that the scope of § 1926(b) protection is limited to the geographical area
(continued...)

-11-

repurchase of its notes from the FmHA on its status as an FmHA debtor prior to 1994. Plaintiff argues that the repurchase did not disrupt its entitlement to protection from competition under § 1926(b), and that, as a result, it is entitled to relief not only for encroachments occurring prior to the repurchase but also for encroachments occurring between the date of the repurchase and the 1994 loan. Defendants urge us to affirm the district court's conclusions that the repurchase extinguished Plaintiff's protection under § 1926(b) and that any encroachments which occurred prior to May 5, 1989, are not actionable.

The legislative background of the loan repurchase program sheds some light on whether Congress intended the protection of § 1926(b) to extend to borrowers who repurchase their obligations from the federal government. Congress enacted provisions requiring the FmHA to sell its notes and other obligations "[a]s part of an overall effort to reduce the federal deficit." Ute Water, 900 P.2d at 89; see OBRA § 1001(a)-(e) (codified at 7 U.S.C. § 1929a note, subsections (a)-(e)). Subsequently, Congress amended OBRA by requiring the FmHA to provide rights of first refusal to its debtors before it attempted to sell the obligations to third party purchasers. See OBRA § 1001(f), as amended by ACA § 803(f) (codified at 7 U.S.C. § 1929a note, subsection (f)). As part of

---

[5](...continued)
being financed by the loan . . . [and that] [i]t would defeat the protection[] intended by that section to [so] limit [it]." Bell Arthur, 173 F.3d at 524.

the same series of amendments, Congress enacted the following provision:

> **Applicability of Prohibition on Curtailment or Limitation of Service.**—Section [1926(b)] . . . shall be applicable to *all* notes or other obligations sold or intended to be sold under this section.

OBRA § 1001(g), as amended by ACA § 803(g) (codified at 7 U.S.C. § 1929a note, subsection (g)) (emphasis added).

Although § 803(g) clearly extends the protection of § 1926(b) to situations in which the government sells notes or other obligations to third parties, courts have reached differing conclusions regarding whether § 803(g) extends the protection to issuers who repurchase their own notes or obligations from the government. The Colorado Supreme Court addressed the interpretation of § 803(g) in a case involving an issuer repurchase in which "the intent of the parties . . . was to keep the . . . bond active and not discharge the debt." Ute Water, 900 P.2d at 93. The intent of the parties was demonstrated not only by testimony to that effect but also by the fact that in transferring the bond back to the water district, the FmHA did not mark the instrument "'paid in full,' which would have canceled or discharged the debt." Id. at 94. Thus, the bond remained outstanding even "after the [water] [d]istrict reacquired the instrument." Id. The court held that § 803(g) extended the protection of § 1926(b) "to *all* notes and bonds sold by the FmHA—including those reacquired by the issuer with the intent not to discharge the instrument, as in the present case." Ute Water, 900 P.2d at

-13-

92 (emphasis added). Thus, the result in Ute Water turned on the facts that the parties did not intend to extinguish the underlying debt and "that state law permitted a bond issuer to reacquire its own bond without extinguishing the debt." Scioto County Reg'l Water Dist. No. 1 v. Scioto Water, Inc., 103 F.3d 38, 41 (6th Cir. 1996) (citing Ute Water, 900 P.2d at 93), cert. denied, 521 U.S. 1111 (1997).

To date, only two federal circuit courts have addressed the issue of whether § 803(g) extends the protection of § 1926(b) to issuers who repurchase their own obligations from the government. Relying on applicable statutory language, congressional intent, and reasons of public policy, these courts have held that § 1926(b) does not apply to situations in which the issuer repurchases its own notes or other obligations from, and at the same time cancels its debt to, the government, in spite of the apparently contrary indication in § 803(g). See Bell Arthur, 173 F.3d at 523; Scioto Water, 103 F.3d at 42.

In Bell Arthur, the Fourth Circuit acknowledged that providing issuers who repurchase their notes with continuing protection from competition–the approach taken by the Colorado Supreme Court in Ute Water and advocated by Plaintiff in this case– "may have some superficial textual appeal" based on the language of § 803(g). Bell Arthur, 173 F.3d at 522. The court went on to explain, however, that "a closer reading of the applicable statutes reveals that such an interpretation

is at odds with their language, the overall statutory structure, and the congressional purposes." Id. The critical distinction lay in the fact that when a third party purchases a note from the FmHA "the issuer's indebtedness remains outstanding," but when an issuer purchases its own notes from the FmHA, and at the same time cancels the notes, "then the indebtedness ends." Id. at 523. According to the court, "[t]he latter transaction is actually a *retirement* of the debt by the issuer rather than a *sale* of the debt." Id. (emphasis added). Because "the issuer of the note who exercises the right of first refusal retires its debt *before* notes can be 'sold or intended to be sold[,]' . . . [the issuer] cannot receive the § 1926(b) protection granted by [§ 803(g)]." Id. Thus, the Fourth Circuit concluded that Congress

> could not have meant to include notes retired because retired notes
> need no protection. The protection afforded by § 1926(b) is meant to
> secure outstanding notes against default by protecting the income of
> the notes' issuer. When the indebtedness–whether to the federal
> government or to its assignees–is retired, however, no such
> protection is needed.

Id.

The Sixth Circuit similarly held that issuers who repurchase their notes from the FmHA are not entitled to continuing § 1926(b) protection. See Scioto Water, 103 F.3d at 42. According to the court, "[w]hen an issuer buys back its own bond and cancels the debt, . . . it no longer qualifies as a debtor for § 1926(b) protection." Id. In the instant case, because the FmHA marked the water

-15-

district's bonds "'paid in full'" when the water district repurchased the bonds, the debt was "discharged, not sold." Id. Thus, the court held that, under the circumstances, § 803(g) applies only to obligations sold to third parties, not to debts repurchased by issuers. See id.

We agree with the Bell Arthur and Scioto Water courts that § 803(g) does not extend the protection of § 1926(b) to issuers who repurchase their obligations from the government and in so doing discharge or cancel the underlying obligation to the government. The overall structure of the statutory scheme indicates that Congress did not intend § 803(g) to apply to issuer repurchases. Because Congress enacted the provision requiring the government to offer rights of first refusal to issuers after it enacted the provisions requiring the sale of its debt to the public, it is likely that Congress considered the two types of transactions to be separate. See OBRA § 1001(a) (codified at 7 U.S.C. § 1929a note, subsection (a)); see also ACA § 803(f) (codified at 7 U.S.C. § 1929a note, subsection (f)). It follows that in referring to notes or obligations "sold or intended to be sold" in § 803(g) Congress was referring only to sales to third parties. Section 803(f) lends credence to this interpretation because it directs the government to offer rights of first refusal to issuers "'*[b]efore* conducting a sale of a portfolio of notes.'" ACA § 803(f)(1) (codified at 7 U.S.C. § 1929a note, subsection (f)) (emphasis added); see Bell Arthur, 173 F.3d at 523.

-16-

Two additional justifications support this analysis.  First, when the government sells a note or other obligation to a third party, it must provide some assurance to the third party about the likelihood that the debt will be repaid.  As the Fourth Circuit explained in Bell Arthur, part of the reason Congress enacted § 803(g) was "undoubtedly to make [the loans the government was selling] more secure upon sale and thus more marketable."  Bell Arthur, 173 F.3d at 523.  By extending the § 1926(b) protection to water associations "'during the term' of the loan," § 803(g) gives "the third party purchaser the same assurance of repayment that the federal government had had as the holder of the notes."  Id.  On the other hand, there is no need to provide assurance of repayment to an issuer who repurchases its own loan.  Second, depending on the terms of a third party sale, the government may remain liable to the purchaser in the event of a default by the issuer.  In comparison, when an issuer repurchases its notes from the government and simultaneously cancels them, there is no risk of continued governmental liability.  We therefore hold that § 803(g) does not extend the protection of § 1926(b) to issuer repurchases when the underlying debt to the government is simultaneously canceled or retired.

In this case, as in Scioto Water, the notes Plaintiff repurchased from the FmHA were marked "SATISFIED IN FULL," Appellant's App., Vol. II at AP597, AP599, and thus "the debt was . . . discharged, not sold."  Scioto Water, 103 F.3d

at 42. Because the § 1926(b) protection does not extend to issuers who repurchase their own notes or other obligations from the FmHA and in so doing discharge the underlying debt to the FmHA, Plaintiff may not seek relief for encroachments which occurred or continued to occur between the date of the repurchase, May 5, 1989, and the date of the final loan, September 28, 1994. However, we still must decide whether the encroachments which occurred prior to May 5, 1989, are actionable. Citing Scioto Water, 103 F.3d at 40-42, and the district court opinion in Bell Arthur, see Bell Arthur Water Corp. v. Greenville Utils. Comm'n, 972 F. Supp. 951, 957-59 (E.D.N.C. 1997), the district court in this case held that, because the repurchase extinguished Plaintiff's entitlement to protection under § 1926(b), no encroachments occurring prior to the repurchase were actionable. We disagree.

First, neither Bell Arthur nor Scioto Water supports the proposition that encroachments occurring prior to an issuer repurchase but during the term of indebtedness are not actionable. The Bell Arthur court simply held that the § 1926(b) protection did not extend *beyond* the date of the repurchase, see Bell Arthur, 173 F.3d at 523-24; it did not hold that water associations would not be entitled to relief for encroachments occurring *prior* to a repurchase, i.e., during the period of indebtedness. In fact, this question was not even before the Bell Arthur court because in that case the only alleged encroachment occurred in 1995,

which was after the water association had repurchased its loans from the FmHA in 1989 and after it had obtained a new loan from the FmHA in 1993. See id. at 520-21. In Scioto Water, the court similarly was not required to decide the issue because the encroachment in that case occurred after the water district repurchased its debt from the FmHA. See Scioto Water, 103 F.3d at 40. As in Bell Arthur, the court merely held that the water district was not entitled to § 1926(b) protection for the period *after* it repurchased its bonds from the FmHA and canceled its debt. See id. at 42.

Second, we can think of no reason why a water association which repurchases or otherwise repays its debts should lose the protection to which it was entitled during the period of indebtedness. To so hold would defeat the purpose of offering the protection because a water association which repurchased or paid off its debt but which otherwise met the statutory requirements would have no recourse for encroachments that occurred or began while it was indebted to the government. Such a rule clearly would defy the language of § 1926(b), which expressly prohibits encroachments "during the term of such loan." 7 U.S.C. § 1926(b). This rule would also create a disincentive for water districts to repay their loans and would encourage municipalities and other competitors to encroach without concern for any resulting liability. We therefore conclude that, even if a water association has repurchased its loan and discharged its debt to the

-19-

government, encroachments which occurred during the term of the loan are protected.

Because Plaintiff was indebted to the FmHA prior to May 5, 1989, and after September 28, 1994, it has satisfied the first prong of the § 1926(b) analysis with respect to those periods. We therefore reverse and remand to the district court for further proceedings consistent with this opinion.[6]

## B.

We now examine whether Plaintiff has established genuine issues of material fact with respect to the "made service available" prong of the § 1926(b) inquiry. Although we have determined that Plaintiff was indebted to the FmHA during the pre-1989 and post-1994 periods, we must assess whether Plaintiff made service available to the customers served by Defendants during those

---

[6]On remand, the district court will be required to address at least three issues with respect to the pre-1989 period. First, as discussed in greater detail below, Plaintiff must demonstrate that it "made service available" to the customers that Defendants allegedly began serving before the repurchase date. Second, even if Plaintiff has met the requirements for § 1926(b) protection for this period, the applicable statute of limitations may bar Plaintiff from seeking redress. Finally, assuming that Plaintiff meets the requirements for § 1926(b) protection and that relief is not barred by the statute of limitations, the court must determine what remedy is appropriate for Defendants' encroachments of Plaintiff's territory.

periods.[7]  In addition, although Plaintiff cannot seek relief for encroachments occurring between May 5, 1989, and September 28, 1994, because it was not indebted to the FmHA during that period, we still must examine whether Plaintiff has established genuine issues of material fact concerning whether it made service available to the customers which Defendants began serving during that period. We undertake this inquiry for purposes of determining whether Plaintiff may seek relief for encroachments which continued beyond the date of the 1994 loan.

Courts are in disagreement about what is required to satisfy the "made service available" requirement of § 1926(b).  One court has held that a water association may meet the requirement simply by showing that it has a legal obligation to provide water service to the customer.  See North Alamo, 90 F.3d at 917 (holding that a legal duty to provide service is the "legal equivalent to . . .

_____

[7]Defendants argue that certain customers are not within Plaintiff's service area because it failed to comply with state law in forming its territory, as defined by state law, in 1991.  However, because Defendants do not seem to challenge the district court's conclusion that Plaintiff "is a continuation of Sequoyah-4 and its successor, RWC," Appellant's App., Vol. III, Doc. 19 at AP957, the contours of Plaintiff's territory should be examined from the date it came into existence as Sequoyah-4.  Further, this argument is not properly before us because the district court did not rule on it.  For these reasons, we assume that the disputed customers are within Plaintiff's territory as it is defined by state law.  Whether the customers are within Plaintiff's service area is the subject of this section of our opinion and depends on whether it made service available to them within the meaning of § 1926(b).

'making service available' under § 1926(b)").[8]  Generally, courts applying the

legal duty test have looked to state law to make the determination.  See, e.g., id.

at 915-916 (examining utility's duty to provide service under Texas law); Bell

Arthur, 173 F.3d at 526 (citing cases examining both existing facilities and state

law duty to provide service and holding that nonprofit water corporation had no

duty to serve under North Carolina law).  Another approach to meeting the

requirement is known as the "pipe[s]-in-the-ground" or "physical ability" test.

Rural Water Sys. #1 v. City of Sioux Ctr., Iowa, 967 F. Supp. 1483, 1525 (N.D.

Iowa 1997); see Pittsburgh County Rural Water Dist. No. 7 v. City of McAlester,

---

[8]Other courts have emphasized that the water association must have a legal right, under state law, to provide service to the customer.  See Rural Water Sys. #1 v. City of Sioux Ctr., Iowa, 967 F. Supp. 1483, 1525 (N.D. Iowa 1997) (explaining that whether a water association has made service available depends partly on "legal authority to provide service"); Rural Water Sys. #1 v. City of Sioux Ctr., Iowa, 29 F. Supp.2d 975, 991 (N.D. Iowa 1998) (indicating that legal right to serve is required to demonstrate that association made service available); cf. Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 238 (6th Cir. 1996) (noting water district's lack of authorization to provide service under Kentucky law).  The distinction between a legal *duty* to provide service and a legal *right* to provide service is crucial because, in our view, the latter is always required.  Without a right to provide service arising from state law, a water association would be unable to assert its entitlement to protection under § 1926(b) in the first instance because the association would not legally have  "provided or made available" any service.  7 U.S.C. § 1926(b); see also City of Sioux Ctr., 967 F. Supp. at 1527 ("Where an indebted association has no legal right to provide service, it is not required by [7 C.F.R. § 1942.17(n)(2)(vii)] to provide such service, and, logically, it also should not obtain protection from § 1926(b) for its illegal provision of service.").  In any event, neither party contests Plaintiff's right to provide service to the customers which are undisputably within its territory.

No. CIV-97-185-B, 1997 WL 835210, at *6 (E.D. Okla. 1997). This test examines whether a water association "has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." Bell Arthur, 173 F.3d at 526; see also Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 237 (6th Cir. 1996) ("[W]hether an association has made service available is determined based on the existence of facilities on, or in the proximity of, the location to be served."). Finally, some courts have examined both the water association's state law duty to provide service and the proximity and adequacy of its facilities in determining whether it made service available. See Bell Arthur, 173 F.3d at 526. Regardless of the manner in which this second prong is satisfied, Plaintiff must have made service available "prior to the time an allegedly encroaching association beg[an] providing service in order to be eligible for [§] 1926(b) protection." Lexington-South, 93 F.3d at 237.

This court has not definitively established a standard for meeting the "made service available" requirement. In Glenpool, we relied on both the association's water "line adjacent to the property and its responsibilities [to provide water service] to applicants within its territory" in concluding that the water association had made service available to the disputed customer. See Glenpool, 861 F.2d at 1214. However, Glenpool did not hold that both a legal duty and proximate and

adequate facilities *were required* to meet this element of § 1926(b). In fact, Glenpool did not expressly hold that Oklahoma water districts have a legal duty to provide service; it merely referred to a specific water district's "responsibilities to applicants within its territory" in affirming a factual finding by the district court. Id.

In this case, the district court specifically determined that Oklahoma "state law does not mandate or require rural water districts to provide water service." Appellant's App., Vol. III, Doc. 19 at AP961; see also Pittsburgh County Rural Water Dist., 1997 WL 835210, at *5 (concluding that Oklahoma law does not impose "any obligation or duty on . . . the district to provide service"). We agree. Under Oklahoma law, the provision of water service centers around the "benefit unit," which is defined as "a legal right to one service connection to the district's facilities and to participate in the affairs of the district." OKLA. STAT. ANN. tit. 82, § 1324.2(7). Landowners within a rural water district's territory may "subscribe to a number of [benefit] units in proportion to the extent [they] desire[] to participate in the benefits of the improvements" made by the districts. Id. § 1324.12. "As long as the capacity of the district's facilities permits, participating members . . . may subscribe to additional units upon payment of a unit fee for each such unit." Id. Further, although water districts must inform the customers within their districts how many benefit units are available for

subscription, the districts have discretion to grant benefit units to new applicants for service, who also must pay a unit fee.  See id.  Two features of these statutes convince us that Oklahoma water districts are not under a state law duty to provide service to the customers within their territories.  First, water districts are not required to provide additional benefit units to existing customers unless they possess the capacity to do so.  See id.  The statutes do not oblige water districts to expand their facilities to provide additional service to existing customers.  Second, water districts have discretion to decide whether to provide benefit units to new applicants.  In short, we cannot discern from the Oklahoma statutes a legal obligation to provide service.

Although we have determined that there is no state law duty to provide service in this case, we think that the existence of such a duty is relevant to the "made service available" inquiry because it substantially affects the likelihood that the association has provided or readily can provide service.[9]  Nevertheless,

_____

[9]Plaintiff argues, and we agree, that the federal regulations governing the FmHA loan program impose a duty to provide service on loan recipients.  In fact, it is clear that by accepting loans from the FmHA, Plaintiff agreed to abide by the governing federal regulations, which specifically require the provision of adequate service to customers "within the service area who can feasibly and legally be served."  7 C.F.R. § 1942.17(n)(2)(vii); see Wayne v. Village of Sebring, 36 F.3d 517, 528 (6th Cir. 1994) (stating that 7 C.F.R. § 1942.17(n)(2)(vii) requires applicants for FmHA funds to "agree, as a condition of receiving funds, that a person within the service area who can feasibly and legally receive water service has a direct and private right of action against the

(continued...)

-25-

we do not think that a such a duty, standing alone, is sufficient to meet the "made service available" requirement. For one thing, to hold that a legal duty is sufficient to meet the requirement would be contrary to the language of the statute, which provides protection only against curtailments of "service provided or made available" by water associations. 7 U.S.C. § 1926(b). In addition, allowing a water district to meet the requirement simply by showing a legal duty to serve may undermine one of the principal goals of the statute, which is to "encourage water development by expanding the number of potential users of such systems." City of Madison, Miss. v. Bear Creek Water Ass'n, Inc., 816 F.2d 1057, 1060 (5th Cir. 1987). "Inherent in the concept of providing service or making service available is the *capability* of providing service, or, at a minimum, of providing service within a reasonable time." Bell Arthur, 173 F.3d at 526. If a water association has a legal duty to provide service but has no proximate or adequate facilities or cannot provide them within a reasonable time, it is the customer who suffers. For these reasons, we think that the second prong of § 1926(b) should focus primarily on whether the water association has *in fact* "made service available," i.e., on whether the association has proximate and

---

[9](...continued)
fund recipient if the recipient fails to make adequate service available"). Because all FmHA loan recipients are subject to this federal duty, however, we do not think that the "made service available" requirement should turn on this duty.

adequate "pipes in the ground" with which it has served or can serve the disputed customers within a reasonable time.

As mentioned above, a water association meets the "pipes-in-the-ground" test by demonstrating "that it has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." Bell Arthur, 173 F.3d at 526. This is essentially an inquiry into whether a water association has the capacity to provide water service to a given customer. See id.; City of Sioux Ctr., 967 F. Supp. at 1525. Plaintiff argues that the district court incorrectly concluded that Plaintiff did not make service available because it either did not have facilities proximate to the customers or because its facilities were insufficient to meet the customers' needs. According to Plaintiff, genuine issues of material fact should have precluded summary judgment on these issues. We examine the customers in the order in which Defendants allegedly began providing service to them.

The Gunter Ridge Addition and the Gold Crown Motel are the only two customers which Defendants allegedly began serving between April 14, 1969, and May 5, 1989. The record shows that Plaintiff has a two-and-a-half-inch line running across the east side of the Gunter Ridge Addition and a two-inch line running across the west side. See Appellant's App., Vol. I, Doc. 6 at AP67. Both lines have been in existence since 1970. See id. The only evidence in the record

indicates that the lines were large enough to meet the potable water needs of the development and that the lines could be upgraded to provide fire protection for approximately $50,000.[10]  See id. at AP411.  The record also shows that Plaintiff has a three-inch water line running across the south side of the property of the Gold Crown Motel, see id. at 67, which has been in existence since 1970, and that this line "would be sufficient to provide potable water service to the motel."  Id. at AP411.  We do not think that this evidence shows, as a matter of law, that Plaintiff did not have sufficiently proximate and adequate facilities to serve these customers or that it would be unable to provide adequate service within a reasonable period of time.  To the contrary, we think this evidence at least establishes genuine issues of material fact as to whether Plaintiff's facilities were proximate and adequate to serve the disputed customers during the pre-1989 period.

With respect to the customers which Defendants began serving between May 5, 1989, and September 28, 1994, the record reveals the following:

---

[10]For remand purposes, we point out that the United States District Court for the Northern District of Ohio recently held that, because § 1926(b) was not enacted to supply fire protection, a water association's capacity to provide fire protection is irrelevant to its entitlement to protection from competition under § 1926(b).  See City of Sioux Ctr., 29 F. Supp.2d at 992-94; cf. Rural Water Dist. #3 v. Owasso Utils. Auth., 530 F. Supp. 818, 823 (N.D. Okla. 1979) (stating that § 1926(b) "was not enacted for the purpose[] of fire protection—it was enacted to provide means of securing a 'safe and adequate supply of running household water.'" (citation omitted)).

(1)     Cherokee Rock Addition:  Plaintiff has a two-inch water line constructed in 1970 which is approximately 200 feet from the development's connection to Defendants' water line.  This line "would be sufficient to provide potable water service" but not to provide fire protection.  Id. at AP411. Plaintiff also has a six-inch line constructed in 1982 which is approximately 1320 feet from the connection and "which is more than sufficient to meet all the water needs of the" development.  Id. at AP66; see also id. at AP411 (stating that six-inch line could provide fire protection for a cost of approximately $7,000).

(2)     FWCC Trucking:[11]  Plaintiff has two-and-a-half-inch lines on the north and south sides of the property.  See id. at AP411.  Both lines were constructed in 1970.  See id.

(3)     J.D. Hill (location number 820127):  The record indicates that Plaintiff has a two-and-a-half-inch line approximately 200 feet to the west of this customer.  See id. at AP67.

(4)     Laster Realty Co.:  Plaintiff has a two-and-a-half-inch line running across the west side of the property.  See id. at AP68.

(5)     Rasamy Mangboupha:  Plaintiff has a two-and-a-half-inch line constructed in 1970 running approximately 400 feet south of this customer.  See id. at AP68.

With respect to FWCC Trucking, J.D. Hill, Laster Realty Co., and Rasamy Mangboupha, the record indicates that Plaintiff's existing facilities could provide potable water service but not fire protection.  See id. at AP411.  However, fire

---

[11]The record indicates that there are two separate FWCC properties, one of which Defendants began serving prior to 1994 and one of which it began serving after 1994.  See Appellant's App., Vol. I, Doc. 5 at AP45 (referring to FWCC Trucking location number 820138, which Defendants began serving prior to 1994, and to FWCC Trucking location number 819929, which Defendants began serving after 1994).  In any event, both properties have two-and-a-half-inch lines approximately 200 feet away.  See id. at AP67, AP411.

protection could be obtained for these customers for approximately $50,000. See id. Like the evidence for the customers which Defendants began serving prior to May 5, 1989, this evidence is sufficient to establish genuine issues of material fact with respect to the proximity and adequacy of Plaintiff's facilities.

Finally, we think the evidence also precludes summary judgment on the customers which Defendants began serving after September 28, 1994. The record reveals the following as to these customers:

(1)     Cherokee Rock Phase I: The record is unclear about Plaintiff's facilities with respect to this development. However, Plaintiff has alleged that the facilities for this area are the same as those for the Cherokee Rock Addition, described above, i.e., a two-inch water line approximately 200 feet from the development's connection to Defendants' water line and a six-inch line approximately 1320 feet from the connection.

(2)     Food Plus/Dollar General Store: Plaintiff has a two-and-a-half-inch line constructed in 1970 running across the south side of this property. See id. at AP66.

(3)     Bob Pruitt Property (John Bogner): Plaintiff has a two-and-a-half-inch line on the north side of the property and a two-and-a-half-inch line on the south of the property. See id. at AP 411. Both lines were constructed in 1970. See id.

(4)     FWCC Trucking Office: Plaintiff has a two-and-a-half-inch line constructed in 1970 running approximately 400 feet to the south of this customer. See id. at AP67.

(5)     OK Industries: Plaintiff has an eight-inch line constructed in 1982 approximately one mile to the east of this customer. See id. at AP410. The record indicates that this line could be extended for approximately $50,000 to meet the customer's needs. See id.

(6)   J.D. Hill Truckwash (location number 820166):  Plaintiff has a two-and-a-half-inch line constructed in 1970 running about 400 feet to the south of this property.  See id. at AP67.

(7)   Doug Harvell:  Plaintiff has a two-and-a-half-inch line running approximately 200 feet south of this customer.  See id. at AP68.

Although Plaintiff's current facilities are sufficient for the customers' potable water needs, the record indicates that, for approximately $50,000, fire protection could be provided for the Food Plus/Dollar General Store, Bob Pruitt, FWCC Trucking, J.D. Hill Truckwash, and Doug Harvell properties.  See id. at AP411. Plaintiff has presented sufficient evidence to withstand summary judgment with respect to whether its facilities were sufficiently proximate to these customers and with respect to whether it had the capacity to serve these customers within a reasonable time.[12]

In short, although additional clarifying proof may be needed to establish the exact distances between Plaintiff's lines and the disputed customers' properties, as well as Plaintiff's precise capacity to serve the disputed customers within a reasonable time, we conclude that Plaintiff has established genuine issues of

---

[12]Defendants argue that Plaintiff released its right to serve the Food Plus/Dollar General Store and the OK Industries customers and that it is now estopped to assert the right to serve these customers.  See Appellee's Br. at 49. Because these issues were not considered by the district court and because the record is insufficient to address them, we leave these issues for the district court on remand.

material fact with respect to whether it made service available to the customers. Indeed, the evidence indicating that Plaintiff's pipes ran across the property of certain customers is certainly sufficient to show that Plaintiff's facilities were proximate to those customers, and evidence showing longer distances between Plaintiff's pipes and the customers' properties clearly raises questions of fact on the issue of proximity. Viewing the evidence in a light most favorable to Plaintiff, we therefore conclude that summary judgment was improper on the issue of whether Plaintiff made service available for the two periods of time for which Plaintiff may seek relief under § 1926(b).

**III.**

In summary, because Plaintiff was indebted to the FmHA between April 14, 1969, and May 5, 1989, it is entitled to seek relief for Defendants' provision of service to the customers within Plaintiff's territory to which it establishes that it made service available. Although Plaintiff is not entitled to recover for any encroachments occurring or continuing between May 5, 1989, and September 28, 1994, because it was not indebted to the FmHA at the time, it may recover for encroachments occurring or continuing after September 28, 1994, the date on which it obtained another loan from the FmHA, so long as it establishes that it made service available to those customers. We also conclude that Plaintiff has

-32-

established genuine issues of material fact regarding whether it made service available to the disputed customers for the encroachments occurring before 1989 and for those occurring or continuing after 1994. As noted above, evidentiary uncertainties should be resolved in favor of Plaintiff, the party seeking to protect its territory, on remand.[13]

Accordingly, the district court's entry of summary judgment is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.

---

[13]We decline to address the additional arguments raised by Plaintiff in its Reply Brief because they were not presented to the district court and are not relevant to our disposition of this summary judgment appeal.