**MOONGATE WATER CO., INC.,**
**a New Mexico public utility,**
**Plaintiff–Appellant,**

**v.**

**BUTTERFIELD PARK MUTUAL DO-**
**MESTIC WATER ASSOCIATION,**
**also known as Butterfield Park Mutu-**
**al Domestic Water Consumers and**
**Mutual Sewage Works Association,**
**Defendant–Appellee.**

**No. 01–2166.**

United States Court of Appeals,
Tenth Circuit.

June 3, 2002.

William A. Walker, Jr. (Leonard J. Piazza, of Sandenaw, Carrillo & Piazza, P.C., Kyle W. Gesswein, Las Cruces, NM, on appellant's opening brief), for Plaintiff-Appellant.

Michael D. Davis (Steven M. Harris of Doyle Harris Davis & Haughey, Tulsa, OK; Matthew P. Holt of Holt & Babington, P.C., Las Cruces, NM, with him on the brief), of Doyle Harris Davis & Haughey, Tulsa, OK, for Defendant-Appellee.

Before HENRY and PORFILIO, Circuit Judges, and SAM *, District Judge.

JOHN C. PORFILIO, Circuit Judge.

The two issues before us spring from a dispute between rival water providers' attempting to connect service to a Dona Ana County, New Mexico resident. That rivalry spilled into federal court when Moongate Water Company sought a declaratory judgment that its competitor, Butterfield Park Mutual Domestic Water Association, could not dampen competition by invoking the territorial protections provided by 7 U.S.C. § 1926(b). In two separate orders, the district court disagreed, first, deciding that Butterfield's outstanding indebtedness and continuing service to the area prohibited Moongate's encroachment; and, second, that Butterfield's redress of its rights warranted attorney's fees under 42 U.S.C. § 1988(b). *Moongate Water Co., Inc. v. Butterfield Park Mutual Domestic Water Association,* 125 F.Supp.2d 1304 (D.N.M.2000).[1] This appeal challenges

---

* The Honorable David Sam, Senior District Judge for the United States District Court of Utah, sitting by designation.

1. The district court's order awarding attorney's fees under 42 U.S.C. § 1988(b) is unpublished. *Moongate Water Co., Inc. v. Butterfield Park Mutual Domestic Water As-*

both decisions. We affirm, in part, and reverse, in part.

## I. Background

Butterfield Park is a non-profit association incorporated in 1969 under New Mexico law, the Sanitary Projects Act of the Law of 1957, to provide water and sewer service to a specified territory. Under its promulgated rules and regulations, residents apply for water service, sign a membership agreement, show proof of property ownership, pay certain fees, and agree to an easement on their property for Butterfield to construct and maintain water and sewer service.

Since 1988, Butterfield provided water to 9165 Berry Patch Lane, a property which was sold in 1999 to Ms. Frances Hutson, a 59–year–old medically disabled woman. Butterfield then contacted Ms. Hutson, advising her of its rules and regulations and requesting she provide a membership application and proof of ownership as well as an easement for a water line over her property. After repeatedly explaining the consequences of her noncompliance, Butterfield terminated service to Ms. Hutson's property.

The following week, Moongate, a public utility incorporated under the New Mexico Public Utility Act, N.M. Stat. Ann. §§ 62–2–1 through 62–2–22 (1978), and regulated by the New Mexico Public Regulatory Commission (NMPRC), connected Ms. Hutson to its water system. Prior to running the line, Moongate asked the NMPRC whether it could connect Ms. Hutson's property without a formal order. The NMPRC responded in a letter, "it does not appear to Staff that [Moongate] would be required to get an order from the NMPRC in compliance with the Final Order in NMPRC Case No. 2791, to extend service to this customer." Moongate also contacted other customers in the Butter-

field service area offering water service at lower cost.

To plug this leak to its service area, Butterfield demanded Moongate disconnect the Hutson water line because it encroached upon territory protected by 7 U.S.C. § 1926(b). That protection was afforded by a provision of the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1921 *et seq.* (the Act), which authorized the Farmers Home Administration (FmHA) to make loans and grants to designated associations to develop and operate water distribution and sewer service facilities in rural areas. In 1972 and 1974, the FmHA had loaned Butterfield the money to construct its facilities. However, in 1987, driven by budgetary concerns, Congress authorized the Secretary of Agriculture to sell the FmHA loans extended under the Act. Butterfield's notes were then transferred to the Community Property Trust No. 1987A, and General Electric Credit Corporation became the servicing agent for the Trustee. Ten years later, GMAC Financial Services (GMAC) was substituted as agent for the Trustee. Butterfield informed Moongate these outstanding loans prohibited Moongate from extending service into its territory.

Moongate then filed the underlying action in federal court seeking a declaratory judgment that 7 U.S.C. § 1926(b)'s monopoly protection is unavailable to Butterfield. In support, it alleged Butterfield's FmHA indebtedness did not transfer to assignees of the notes and Butterfield was not serving Ms. Hutson at the time Moongate extended service.

Relying on *Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow,* 191 F.3d 1192, 1197 (10th Cir.1999), which sets forth the requisite elements to muster

*sociation,* No. CIV 00–0063 (D.N.M. Apr. 24, 2001).

§ 1926(b)'s protection, a qualified water association must, first, have a continuing indebtedness to the FmHA, and, second, have provided or made available service to the disputed area, the district court concluded Butterfield is entitled to § 1926(b) protection to its service area. The court found, "Butterfield's ability to repay its federal loan and to provide a low per user cost to its customers depends in part on the economic well-being and territorial integrity of its service area." *Moongate*, 125 F.Supp.2d at 1310.

In a second unpublished order, the district court concluded Moongate, though a private company, is, in fact, substantially regulated by the NMPRC and possesses powers, especially to condemn property, which typically belong to a state actor. Under this analysis, Moongate's action in extending a water line to the disputed property was done under color of state law. Though recognizing its discretion to award fees, especially in light of Moongate's representation it relied on NMPRC's advice and in good faith provided water to a woman with "serious health problems" whom Butterfield ignored when it terminated service, the court concluded attorney's fees were available as a matter of law but should nonetheless be reasonable to avoid proliferating the litigation. Moongate challenges both orders.

## II. Application of 7 U.S.C. § 1926(b)

### A.

Section 1926(b) is a component in a "federal statutory scheme to extend loans and grants to certain associations providing soil conservation practices, water service or management, waste facilities, or essential community facilities to farmers, ranchers, and other rural residents." *Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2*, 861 F.2d 1211, 1214 (10th Cir.1988). In return for such indebtedness, Congress tied protection from competition, providing:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b). In *Sequoyah*, we acknowledged Congress' express intent "to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system." 191 F.3d at 1196 (*quoting* S.Rep. No. 566 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309).

In challenging the district court's conclusion Butterfield is entitled to § 1926(b)'s protection against its competitive service, Moongate contends Butterfield's indebtedness was extinguished when Congress required the transfer of its FmHA loans to private lenders under the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 1001(a), 100 Stat. 1874 (1986) (OBRA), without specifically attaching the antitrust provision. Although Congress later amended OBRA to carry over the monopoly protection of § 1926(b), Moongate maintains that amendment represents a change to existing law, not a clarification as the district court found; thus, the amendment is presumed to apply prospectively. Moongate

faults the district court's masking this error in statutory construction by too broadly applying *Sequoyah's* proviso that doubts over "whether a water association is entitled to protection from competition under § 1926(b) should be resolved in favor of the FmHA-indebted party seeking protection for its territory." *Moongate*, 125 F.Supp.2d at 1308 (*quoting Sequoyah*, 191 F.3d at 1197 (citation omitted)).

At the time Butterfield transferred its FmHA loans to a private lender, Congress did not intend to extend monopoly protection, Moongate asserts. It advocates we should distinguish this case from *Sequoyah* and *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517 (4th Cir. 1999), by constructing a moat around this perceived statutory lapse which, it asserts, neither this precedent nor legislative history can bridge. The confluence of this statutory interpretation with important policy concerns disfavoring monopolies mandates reversal, Moongate urges. We disagree.

In the Fourth Circuit case, Bell Arthur, a non-profit water service corporation, sought protection under § 1926(b) against a city and its utilities commission which, it alleged, encroached upon its service area. Bell Arthur, however, had repurchased and cancelled all of its outstanding notes to the FmHA but contended the statutory structure of § 1926(b) "under which it retired its indebtedness" retained the service area protection.

Rejecting this proposition, the Fourth Circuit configured the components of the Act and its subsequent amendments. OBRA, it found, "required FmHA to sell off enough federally insured notes to raise specified amounts of revenue for the federal government to reduce the national deficit." *Bell Arthur*, 173 F.3d at 522. The following year, the Agricultural Credit Act of 1987(ACA) amended OBRA to give water service associations with FmHA loans "a right of first refusal to purchase [their]

own notes at a discount before they were offered for sale to the general public under § 1001(a)." *Id.* (*citing* Agricultural Credit Act of 1987, Pub. No. 100–233, Title VIII, § 803(f), 101 Stat. 1714 (1988); OBRA § 1001(f) as amended). The ACA further stated:

> Applicability of Prohibition on Curtailment or Limitation of Service–Section [1926(b) ] ... shall be applicable to all notes or other obligations sold or intended to be sold under this section [§ 1001 of OBRA].

§ 1001(g).

The revised statutory scheme thus included a right-of-first-refusal provision allowing any issuer of notes ordered sold under OBRA to retire its indebtedness before offering the notes for sale to third parties. The Fourth Circuit explained,

> OBRA § 1001(f), as amended, provides that *"[b]efore conducting a sale of a portfolio of notes,"* the Secretary was required to offer the notes to the issuer.... The sale referred to in § 1001(f) is the same sale to third parties which is mandated by § 1001(a) and to which protection is extended by 1001(g). Since the right of first refusal necessarily precedes *the sale* of a portfolio of notes, the issuer of the note who exercises the right of first refusal retires its debt *before* the notes can be "sold or intended to be sold" and therefore cannot receive the § 1926(b) protection granted by § 1001(g). This is simply a matter of logic.

173 F.3d at 523. This interpretation, the court emphasized, fulfilled the goals of § 1926(b), principally, protecting federal loans insured by the Rural Development Insurance Fund.

> This purpose is evident in the language [of] § 1926(b) which extends the subsection's protection only "during the term of such loan." 7 U.S.C. § 1926(b). Af-

ter Congress ordered the sale of these federally insured loans to help balance the budget, it added § 1001(g) to OBRA to continue the protection of § 1926(b) on the loans it was selling, undoubtedly to make them more secure upon sale and thus more marketable.... Thus, under § 1001(g), water services associations would continue to enjoy the income-preserving protections of § 1926(b) "during the term" of the loan, giving the third party purchaser the same assurance of repayment that the federal government had had as the holder of the notes.

*Id.*

This analysis is the undercurrent of the Fourth Circuit's holding "OBRA § 1001(g) (extending § 1926(b) protections to notes sold or intended to be sold) applies only to sales of notes to third parties under § 1001(a) and not to the retirement of indebtedness authorized by § 1001(f)." *Id.; see also Scioto County Reg'l Water Dist. No. 1 v. Scioto Water Inc.,* 103 F.3d 38, 42 (6th Cir.1996) ("When an issuer buys back its own bond and cancels the debt, ... it no longer qualifies as a debtor for § 1926(b) protection.").[2] We embraced this analysis in *Sequoyah,* agreeing that "sold or intended to be sold" referred only to sales to third parties and does not apply to issuer repurchases when the underlying debt to the government is simultaneously cancelled or retired. 191 F.3d at 1198.

■ Relying on *Sequoyah* and *Bell Arthur* to reject Moongate's disconnecting Butterfield's outstanding loans still held by GMAC from this overall statutory design, the district court buttressed its analysis by noting that the ACA amendments in question were entitled "Agriculture Programs: Technical Corrections, An Act to make

technical and correcting changes in agriculture programs." Act of Dec. 12, 1989, Pub.L. No. 101–220, 1989 U.S.C.C.A.N. (103 STAT. 1876). The plain language of the ACA amendments, enacted one year after OBRA, and the legislative history are unmistakable. Butterfield *sold* its FmHA notes as required by OBRA but continues "to enjoy the income-preserving protections of § 1926(b) 'during the term of the loan.'" *Bell Arthur,* 173 F.3d at 523. This reading preserves the meaning of the phrase "during the term of the loan."

Indeed, unlike *Sequoyah* where the water association had repurchased its loans, Butterfield remains indebted on what were originally FmHA loans. We, therefore, hold the district court did not err in concluding Butterfield has satisfied the indebtedness element of § 1926(b).

**B.**

■ Moongate contests the second prong of § 1926(b), contending the district court usurped the jury's role in deciding Butterfield's easement and fees were not unreasonable and, thus, service was made available to the property. It sets this conclusion against the irrefutable facts that Ms. Hutson did not become a member of the Butterfield association and the NMPRC advised Moongate, under that circumstance, it could extend service without a formal order. Thus, it maintains, the district court erred in resolving disputed material facts on summary judgment.

■ In *Sequoyah,* we instructed that determination of the second prong of § 1926(b) "should focus primarily on whether the water association has *in fact* 'made service available,' i.e., on whether

---

**2.** We note the Colorado Supreme Court reached a contrary conclusion under distinct facts. *City of Grand Junction v. Ute Water Conservancy Dist.,* 900 P.2d 81 (Colo.1995)

(issuer who repurchased FmHA bonds intended not to discharge the debt and FmHA did not mark the bond "paid in full").

the association has proximate and adequate 'pipes in the ground' with which it has served or can serve the disputed customers within a reasonable time." 191 F.3d at 1203. The "pipes-in-the-ground" test is satisfied by a showing the water association has "adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." *Id. (quoting Bell Arthur,* 173 F.3d at 526). This test amounts to asking whether the water association has the capacity to provide water service to a given customer. *Id.*

In *Rural Water Dist. No. 1, Ellsworth County, Kansas v. City of Wilson, Kansas,* 243 F.3d 1263 (10th Cir.2001), we added a consideration of costs as relevant to the test whether service is made available. We recognized that while adequate facilities adjacent to the area may provide service, the "cost of those services may be so excessive that it has not made those services 'available' under § 1926(b)." *Id.* at 1271. Although we did not suggest water associations must be competitive with municipal facilities, we stated, " § 1926(b) should not be construed so broadly as to authorize the imposition of *any* level of costs." *Id.*

The district court found Butterfield had provided water service to the Berry Patch Lane property since 1988 and to the entire area for many years. Upon the evidence before it, the court concluded the fees Butterfield attempted to assess and the easement to maintain and service the line were not unreasonable. On this record, the district court did not err in deciding Butterfield satisfied the second prong of § 1926(b). Coupled with our holding the indebtedness element was met, this conclusion assures Butterfield's entitlement to § 1926(b) protection.

### III. Availability of § 1988 Attorney's Fees to Butterfield

In its counterclaim, Butterfield sought redress under 42 U.S.C. § 1983 of the violation of its federal right under § 1926(b), as well as declaratory relief under 28 U.S.C. § 2201. After judging Butterfield the prevailing party on the merits, the court proceeded to examine whether Moongate is a state actor whose action in encroaching on Butterfield's territory was taken under color of state law.

The court found though Moongate is a private water company, it is a public utility because it provides an essential public service. That fact coupled with the extensive regulation with which the NMPRC endows that status surely explained, the court believed, the import of NMPRC's nominally "informal" permission for Moongate to extend service. "It is inconceivable that Moongate would have asked for permission, and then acted if permission had been denied. Thus, it is rational to conclude that but for the influence and direction of the overseeing state agency, Moongate would not have violated § 1926(b) by providing service to Ms. Hutson," the court observed. Given this "close nexus," the court concluded Moongate's actions were taken under color of state law and awarded attorney's fees under § 1988(b).

Moongate contends Butterfield's evidence falls short of proof of state action under the close nexus test adopted by the district court. It maintains none of the facts (power derived from state law; heavily regulated; and informal permission from the NMPRC), standing alone or cumulatively, demonstrates the requisite connection between the state and the challenged action of a regulated entity. It relies upon *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d

534 (1982), which demand not merely a close relationship but also governmental coercion or substantial encouragement, not mere authorization. We agree.

■ *Jackson,* a case involving remarkably similar facts, frames our review. In that case, Metropolitan Edison Company, a privately owned and operated Pennsylvania corporation, terminated service to a customer who was delinquent in paying her electricity bill. Ms. Jackson then filed suit under § 1983 alleging she was deprived of her Fourteenth Amendment right to a hearing and an opportunity to pay her bill before the electrical company could terminate service. She maintained that under state law she was entitled to reasonably continuous electrical service; and, the company's disconnecting that service based on a provision of its general tariff filed with the Pennsylvania Public Utility Commission (PPUC) constituted state action. 419 U.S. at 348, 95 S.Ct. 449. The Third Circuit affirmed the district court's dismissing her complaint, and the Supreme Court granted Ms. Jackson's petition for certiorari.

Recognizing the damoclean dichotomy set forth by the Fourteenth Amendment which shields private conduct however discriminatory and wrongful, the Supreme Court cautioned, "While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Id.* at 350, 95 S.Ct. 449. Nonetheless, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. 449 (citation omitted). Because the "true nature of the State's involvement may not be immediately obvious, [ ] a detailed inquiry may be required in order to determine whether the test is met." *Id.* (citation omitted).

Addressing each of those facts, the Court found providing an essential public service or being guaranteed certain monopoly powers did not, standing alone, become state action; nor was following the particular regulations of the state regulatory scheme equivalent to the state's "imprimatur" on the particular practice. Consequently, Metropolitan's disconnecting Ms. Jackson's electricity as required by the state regulatory scheme did not transform the conduct into state action. "[Metropolitan's] exercise of the choice allowed by state law where the initiative comes from it and not from the state, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Id.* at 357, 95 S.Ct. 449.

Here, too, although the district court credited the NMPRC with placing an imprimatur, informal in name, on Moongate's extending service, that "permission" is not the equivalent of the NMPRC's instigating the act itself. The record does not show NMPRC encouraged Moongate to expand its water service into Butterfield's territory but only acknowledged that under Moongate's present certificate of necessity, it could connect service without formal approval. *Jackson* specified the two actions are distinguishable, and *Blum* explained the distinction, stating, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." 457 U.S. at 1004–05, 102 S.Ct. 2777. *Blum* thus amplified *Jackson's* "imprimatur" by asserting that a "State normally can be held responsible for a private decision *only when [the State] has exercised coercive power or has pro-*

*vided such significant encouragement, either overt or covert,* that the choices must in law be deemed to be that of the State." *Id.* at 1004, 102 S.Ct. 2777 (citations omitted) (emphasis added).

Distinguishing this public utility's act from Metropolitan's, Butterfield correctly notes under N.M. Stat. Ann. § 62–2–16 of the New Mexico Public Utility Act, Moongate has the power of eminent domain, "traditionally the exclusive prerogative of the State," *Jackson,* 419 U.S. at 353, 95 S.Ct. 449, "for purposes of carrying out" the state regulatory scheme under N.M. Stat. Ann. § 62–2–16. That power, percolated by its status as a public utility regulated by the NMPRC "which controls the areas and customers to whom Moongate may sell water," clearly distinguishes these facts and the action taken here from those in *Jackson,* Butterfield urges.

Indeed, *Jackson* observed, "[i]f we were dealing with the *exercise* by Metropolitan *of some power delegated to it by the State* which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one." 419 U.S. at 353, 95 S.Ct. 449 (emphasis added). However, simple possession of sovereign power does not convert a private entity into a state actor. Indeed, that transmogrification occurs only when the entity *exercises* that power. As the Court noted in *Jackson,* the nexus test must begin with the private entity's exercising "some power ... traditionally associated with sovereignty." *Id.* Here, Butterfield does not allege Moongate attempted to condemn Ms. Hutson's property for the purpose of connecting water service. Instead, it alleged Moongate used its state-derived authority to sell water to encroach on its territory.

Had the NMPRC ordered or requested Moongate to supply water to Ms. Hutson, this would be a different case. In the absence of that circumstance, under *Jackson,* Moongate's conduct is not state ac-

tion. The district court therefore erred in holding otherwise, and we reverse the award of attorney's fees under § 1988(b).

In sum, we conclude the district court correctly extended § 1926(b) protection to Butterfield against Moongate's encroachment and **AFFIRM.** We **REVERSE** the grant of attorney's fees, however, based on that act.