# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2006

_____

| | | |
|---|---|---|
| Public Water Supply District | * | |
| No. 3 of Laclede County, Missouri, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| City of Lebanon, Missouri, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 12, 2010
Filed:  May 14, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and JARVEY,[1] District Judge.

_____

GRUENDER, Circuit Judge.

Public Water Supply District No. 3 of Laclede County, Missouri ("the District") brought this suit against nearby City of Lebanon, Missouri ("the City"), alleging that the City is illegally providing water and sewer services to customers within the District's boundaries.  The District argues that the City, in providing services to these customers, violated the requirement of 7 U.S.C. § 1926(b) that "[t]he service provided or made available through [the District] shall not be curtailed or limited."  Because we

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa, sitting by designation.

conclude that the District is not entitled to § 1926(b) protection for any of the disputed customers, with the possible exception of customers at one property development, we affirm in part and reverse and remand in part the district court's grant of summary judgment to the City.

## I.    BACKGROUND

The District was created in 1967 to provide water service to customers within boundaries established in the District's Decree of Incorporation. In 1998, the Decree of Incorporation was amended to authorize the District also to provide sewer service. On August 31, 2007, the District closed on a $2 million loan from the United States Department of Agriculture ("the USDA loan"). The USDA loan was made pursuant to 7 U.S.C. § 1926(a) and was for the purpose of extending and improving the District's sewer system. The USDA loan was secured by the District's net revenue from its sewer operations. As a federally indebted rural water association, the District became insulated from competition under 7 U.S.C. § 1926(b), which protects a rural water association's service area from certain incursions by nearby cities. Specifically, § 1926(b) states that

> [t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

At the time the District closed on the USDA loan, the City was already providing sewer and water services to some customers within the District's boundaries. After the District closed on the USDA loan, the City extended service to additional

customers within the District's boundaries, though not to any customers whom the District was already serving.

On October 2, 2007, the District filed this suit against the City, alleging that the City violated § 1926(b) by providing sewer and water services to certain customers within the District's boundaries. The District sought injunctive relief to prevent the City from continuing to serve these customers, as well as damages from the date the District closed on the USDA loan, August 31, 2007. This dispute centers on the District's claim that, as a result of its USDA loan for sewer development, § 1926(b) entitles the District to be the exclusive sewer and water service provider for customers to whom the District has made service available but to whom the City currently provides service. These disputed customers can be divided into three sets: (1) sewer customers the City began serving before August 31, 2007; (2) water customers, regardless of when the City began providing service to them; and (3) sewer customers living in seven tracts of properties that the City began serving after August 31, 2007.[2] The district court granted the City's motion for summary judgment, holding that § 1926(b) does not entitle the District to be the exclusive service provider for any of these sets of disputed customers. The District appeals.

## II.    DISCUSSION

"We review a district court's grant of summary judgment *de novo*, construing the record in the light most favorable to the nonmoving party." *Irving v. Dormire*, 586 F.3d 645, 647 (8th Cir. 2009). The Consolidated Farm and Rural Development Act of 1961 authorizes the USDA to issue loans "to associations, including corporations not operated for profit, Indian tribes on Federal and State reservations and other federally recognized Indian tribes, and public and quasi-public agencies." 7 U.S.C.

_____

[2]For simplicity we use the term "tracts of properties" to refer to these seven clusters of properties, which variously consist of neighborhood developments, nearby groups of residences, and individual residences.

§ 1926(a)(1). We will refer to these associations as "rural districts." The qualifying federal loans made to rural districts are "to provide for the application or establishment of soil conservation practices, shifts in land use, the conservation, development, use, and control of water, and the installation or improvement of drainage or waste disposal facilities, recreational developments, and essential community facilities." *Id.* When such a loan is made, § 1926(b) protects the federally indebted rural district's service area from certain incursions by nearby cities.

We have only once before addressed the merits of a claim based on § 1926(b). *See Rural Water Sys. No. 1 v. City of Sioux Center*, 202 F.3d 1035 (8th Cir. 2000). In *Sioux Center*, we noted that "any '[d]oubts about whether a water association is entitled to protection from competition under § 1926(b) should be resolved in favor of the [USDA]-indebted party seeking protection for its territory.'" *Id.* at 1038 (quoting *Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1197 (10th Cir. 1999)). Nonetheless, "[o]ur role is to interpret and apply statutes as written, for the power to redraft laws to implement policy changes is reserved to the legislative branch." *Doe v. Dep't of Veterans Affairs*, 519 F.3d 456, 461 (8th Cir. 2008). With these principles in mind, we proceed to address the District's claims with respect to each of the three sets of disputed customers.

A.

The District closed on the USDA loan on August 31, 2007. The District argues that as of August 31 the City lost its right to serve sewer customers within the District's boundaries, even though the City began serving many of those customers before the District obtained the USDA loan. The City urges us to reject the District's "continued service theory" by holding that the City's continuing to provide service to these customers does not violate § 1926(b) because the statute merely prevents cities from commencing service to new customers. Consequently, we must decide whether the timing of the City's initial provision of service to these customers is relevant to

whether the City violated § 1926(b).  The scope of § 1926(b) protection, which depends in part on the relevance of the timing of the City's initial provision of service, is a question of statutory interpretation, which we review de novo, *see Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 693 (8th Cir. 2009).

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. ---, 129 S. Ct. 681, 685 (2009).  The key operative provision of § 1926(b) provides that a rural district's service "shall not be curtailed or limited."  In this context, the verbs "curtail" and "limit" connote something being taken from the current holder, rather than something being retained by the holder to the exclusion of another.  *See* The New Shorter Oxford English Dictionary 575, 1591 (4th ed. 1993) (defining "curtail" as "[s]horten in . . . extent or amount; abridge"; defining "limit" as "set bounds to; restrict"); *see also CSL Utils., Inc. v. Jennings Water, Inc.*, 16 F.3d 130, 135 (7th Cir. 1993) ("The cases and fragments of legislative history available to us all seem to have in mind curtailment resulting *from substitution of* some third party as a water-supplier for [the rural district]." (emphasis added)).[3]  Moreover, § 1926(b)'s enumerated methods of curtailing or limiting a rural district's service area—"*inclusion* of the area . . . within the boundaries of any municipal corporation" or "*granting* of any private franchise for similar service"—reinforce the notion that the statute prevents a city from taking customers served by a rural district, not a city's passive continuation of service to its

---

[3]The legislative history is consistent with such a reading.  Subsection (b) was added to § 1926 in 1961 "to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise *be developed* with the expansion of the boundaries of municipal and other public bodies into an area *served by* the rural system."  S. Rep. 87-566, 1961 U.S.C.C.A.N. 2243, 2309 (emphasis added).

customers.[4]  Thus, both the terms' ordinary meanings and their particular usages within the statute are inconsistent with the District's argument that it is entitled to take sewer customers whom the City started serving before the District obtained the USDA loan.  These key terms suggest that a city curtails or limits service within the meaning of § 1926(b) when it initially provides service to a customer, not when it continues to do so.

Furthermore, the plain language of the statute specifically restricts its application to "*such* associations."  (Emphasis added.)  Giving effect to the term "such" requires that we read the statute to protect a subset of all rural districts, namely, only those rural districts that have a qualifying federal loan.  Because the District claims that the timing of the City's initial provision of service is irrelevant, the District would essentially remove this limitation from the statute, forcing cities to operate in the shadow of § 1926(b), even when a nearby rural district had no qualifying federal loan.  Under this scenario, cities would face the constant threat that a rural district will someday obtain a qualifying federal loan and bring suit under § 1926(b), thereby stranding the city's investment in infrastructure it had already built to serve those customers.  A rural district would be insulated from competition even without a

[4]Section 1926(b) could be read to prohibit a city from curtailing or limiting a rural district's service only by these enumerated methods.  While the City has neither altered its boundaries since the District obtained the USDA loan nor granted any franchise for service in the area, the district court held that § 1926(b) is not limited to those two types of incursions.  Instead, the district court held that § 1926(b) also protects rural districts against other types of incursions that do not involve a boundary change or franchise grant. *See Pub. Water Supply Dist. No. 3 v. City of Lebanon*, No. 07-cv-3351, slip op. at 5 (W.D. Mo. June 26, 2008) ("While the City's reliance on the statutory language has some appeal, the remaining provisions of § 1926(b) and the broad application of the statute by the federal courts do not support such a literal reading.").  On appeal, the City does not challenge the district court's holding on this issue.  We assume for the purposes of this appeal that § 1926(b) protects the District against the City's provision of service, regardless of whether this alleged curtailment or limitation involved the City changing its boundaries or granting a franchise.

qualifying federal loan because no rational city would make such an investment under those circumstances. Thus, the "well-established principle[] of statutory interpretation that require[s] statutes to be construed in a manner that gives effect to all of their provisions," *United States ex rel. Eisenstein v. City of New York*, 556 U.S. ---, 129 S. Ct. 2230, 2234 (2009), counsels against adopting the District's continued service theory as the proper interpretation of § 1926(b). The statute's plain language suggests that the scope of protection against competition is more limited than the District's continued service theory would allow.

Additionally, § 1926(b) includes a specific timing element. In particular, it provides that service "shall not be curtailed or limited . . . during the term of such loan." This phrase limits the scope of a rural district's exclusive provider status to the period during which the qualifying federal loan is outstanding. The District's argument that the City's continuing to provide service to its existing customers violates § 1926(b) effectively eliminates this phrase from the statute. Under the District's view, at any point in time a rural district can obtain a qualifying federal loan and then challenge a city's continuing to provide service, regardless of whether a city's incursion occurred "during the term of such loan." Here again, we reject the District's interpretation as inconsistent with the rule that "statutes [are] to be construed in a manner that gives effect to all of their provisions," *Eisenstein*, 129 S. Ct. at 2234.[5]

---

[5]Although the District has not argued so, we note that a strict grammatical reading of the statute might suggest that the phrase "during the term of such loan" modifies only the "granting of any private franchise," which it immediately follows, rather than the earlier phrase "shall not be curtailed or limited." However, given the other statutory language we have already discussed and the purposes of the statute discussed below, we decline to adopt this narrower reading. *See Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy" ). Moreover, even under this alternative reading of the statute, the District's continued service theory would nullify the limiting phrase, "during the term of such loan," at least as it pertains to the granting of a franchise.

Finally, "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).[6] "Congress enacted section 1926(b) to encourage rural water development and to provide greater security for [USDA] loans." *Sioux Center*, 202 F.3d at 1038. Rejecting the District's continued service theory is not inconsistent with these purposes. Again, if § 1926(b) permitted rural districts to capture customers that a city began serving before a rural district obtained a qualifying federal loan, cities would not be willing to invest in the necessary infrastructure to serve customers within a rural district's boundaries because such investments would be rendered worthless by a rural district that obtains a qualifying federal loan. Creating such a disincentive would undermine the purpose of encouraging rural utility development. Additionally, rural districts can continue to use § 1926(b) to protect their exclusive right to serve their existing customer base during the time of the qualifying federal loan, thereby ensuring the continued security of the loan. In sum, the plain language of the statute, the rule in favor of giving effect to all terms in the statute, and our analysis of the statute's purposes all confirm that the City did not violate § 1926(b) merely by continuing to provide service to those customers it began serving before the District obtained the USDA loan.

Other circuits have also addressed this question, though in cases presenting somewhat different facts. Analyzing § 1926(b)'s "curtailed" and "limited" language in a similar manner, the Sixth Circuit distinguishes between "offensive" and "defensive" uses of § 1926(b). *See Le-ax Water Dist. v. City of Athens*, 346 F.3d 701,

---

[6]With respect both to the sewer customers served before the District closed on the USDA loan and to water customers, the District argues that the question whether a particular interpretation furthers the policy goals of § 1926(b) is a question of fact, precluding summary judgment. We reject this argument. The underlying question remains one of statutory interpretation, a pure question of law. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) ("Because statutory terms are at issue, their interpretation is a question of law . . . .").

708 (6th Cir. 2003) ("The statute's use of phrases like 'curtailed' and 'limited' to describe the municipality's interference with the rural water association suggests that a rural water association must already be providing service to an area before the protections of § 1926(b) apply."). In *Le-ax*, the Sixth Circuit rejected a rural water district's attempt to use § 1926(b) to become the exclusive service provider for a new development that it had not previously served. *Id.* The Sixth Circuit adopted a categorical rule prohibiting rural districts from making "offensive" use of § 1926(b) by "seeking to use the statute to foist an incursion of its own on users . . . that it has never served or made agreements to serve." *Id.* at 707. In contrast, the *Le-ax* court read § 1926(b) to authorize "defensive" uses, allowing rural districts to "use the statute to protect [their] users or territory from municipal incursion." *Id.*

We recognize that the Tenth Circuit has addressed this question twice before and taken a contrary approach, albeit without much discussion of the issue. *See Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694 (10th Cir. 2004); *Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192 (10th Cir. 1999)*.* Both *Pittsburg County* and *Sequoyah County* involved rural water districts that were previously federally indebted, but both districts later paid off their qualifying federal loans. Without active loans, § 1926(b) protection did not apply, and nearby cities began providing water service to customers within the rural water districts. After the cities started providing service to these customers, the rural water districts acquired new qualifying federal loans under § 1926(a), restoring their § 1926(b) protection. In both cases, the Tenth Circuit held that the districts could sue to reclaim the customers that the cities began serving during the time between the districts' periods of federal indebtedness. On this view, "all § 1926 claims based on service by [a city] to customers within the limitations period were not otherwise barred by the fact that [the city] was serving those customers prior to the [subsequent] loan." *Pittsburg County*, 358 F.3d at 713; *see also id.* ("The fact that a municipality had provided service to those properties prior to the [qualifying federal] loan was no

-9-

bar in *Sequoyah* to claims arising out of a city's service during the period of indebtedness.").

None of these cases is precisely analogous to this case. In *Le-ax*, the rural district brought suit over customers outside the association's boundaries, while here the customers are within the District's boundaries.[7] And unlike the rural districts in *Pittsburgh County* and *Sequoyah County*, the District never had a qualifying federal loan before August 31, 2007, and thus never had § 1926(b) protection with respect to customers the City served before that date. Nonetheless, neither of those distinctions affects our analysis of this issue. To the extent there is a conflict between these cases, we find the Sixth Circuit's distinction between offensive and defensive uses of § 1926(b) in *Le-ax* to be more persuasive and consistent with our reading of the statute. Section 1926(b) provides a shield, not a sword. Because we conclude that the City's continuing to provide service to customers it began serving before the District obtained the USDA loan does not violate § 1926(b), we affirm the district court's grant of summary judgment with respect to this set of customers.

B.

The District next challenges the City's right to provide water service to customers within the District's boundaries. Although the USDA loan was secured to expand the District's sewer system and was secured only by its sewer revenues, the District argues that the USDA loan also triggers § 1926(b) protection with respect to its water service. We must determine whether "[t]he service provided or made available" under § 1926(b) refers solely to the service for which a qualifying federal loan was obtained and which provides the collateral for the loan, as the City argues, or to all services that a rural district provides, as the District would have us hold. This

---

[7]In Ohio, rural water districts are not confined to providing service solely within their established boundaries. Ohio Rev. Code Ann. § 6119.01(A).

appears to be a question of first impression.[8]  As another question of statutory interpretation, we review the issue de novo.  *See Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693.

We again begin with the plain language of the statute, *Jimenez*, 129 S. Ct. at 685, which refers to "[t]he service provided or made available."  Both parties argue that the plain language supports their position, and each accuses the other of reading additional terms into the statute.  The District claims that adopting the City's interpretation would change the phrase "the service" into "the financed service," adding a restrictive term to the statute.  The City argues that adopting the District's interpretation would add an expansive term to the statute, changing "the service" into "all services."  These arguments underscore the ambiguity in the phrase "the service provided or made available."  The term "service," standing alone, reasonably may be read to refer to a single type of service or to multiple types of service.  Thus, § 1926(b)'s isolated use of the term "service," without explanation, provides little insight into the interpretive question before us.

However, "[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole."  *United States v. Morton*, 467 U.S. 822, 828 (1984). Notably, § 1926(a) repeatedly employs both the terms "service" and "services."  In doing so, Congress distinguished between a single "service" and multiple types of "services." *Compare* 7 U.S.C. § 1926(a)(4)(B) ("The term 'project' shall include facilities

---

[8]Other courts have addressed the related question whether § 1926(b) protection is limited to customers receiving service from the particular project being financed by the qualifying federal loan or whether it extends to all customers receiving the type of service financed by the loan.  *See Sequoyah County*, 191 F.3d at 1198 n.5; *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517, 524 (4th Cir. 1999) ("We can find no statutory support for the . . . position that the scope of § 1926(b) protection is limited to the geographical area being financed by the loan.").  We need not address this issue, since the District's argument focuses only on protection for other types of services, not other projects or areas receiving the same type of service.

-11-

providing central *service . . . .*"), *and* 7 U.S.C. § 1926(a)(20)(E) ("[T]he Secretary may make grants to State agencies for use by regulatory commissions in states with rural communities without local broadband *service*"), *with* 7 U.S.C. § 1926(a)(11)(B)(i) (directing the Secretary of Agriculture to consider "the extent to which the applicant provides development *services*," which include training, establishing business centers, and analyzing business opportunities), *and* 7 U.S.C. § 1926(a)(20)(E) (describing grants to "cable operators that establish common carrier facilities and *services*"), *and* 7 U.S.C. § 1926(a)(23) (describing grants "to local governments to improve the infrastructure, *services*, and business development capabilities of local governments") (emphasis added throughout). In § 1926(b), Congress used only the singular term "service." Read *in pari materia* with 7 U.S.C. § 1926(a), Congress's pattern of using the singular to refer to a single type of service while using the plural to refer to a collection of multiple types of services is decisive. Because § 1926(b) employs the singular term, we conclude that "the service provided or made available" is best interpreted to include only the type of service financed by the qualifying federal loan.[9]

As before, we also look to "the whole statutory text, considering the purpose and context of the statute," *Dolan*, 546 U.S. at 486, which in this case is "to encourage rural water development and to provide greater security for [USDA] loans," *Sioux Center*, 202 F.3d at 1038. While adopting the District's broad view of the scope of protection would undoubtedly benefit the District and other rural districts, it would not promote rural water development because other services a rural district might happen to provide are irrelevant to maintaining the necessary economies of scale to allow rural utility associations to remain viable and to keeping the per-user cost low for the service financed by the loan. *See N. Alamo Water Supply Corp. v. City of San Juan*,

---

[9]In this case, the USDA loan was both for improvements to the District's sewer system and was secured by sewer revenues. Therefore, we need not decide whether it is the type of service which provides the collateral for the loan or the type of service for which the loan was made that is entitled to protection. Here, the loan was not made to finance a water project, nor did the District's water revenues secure the loan.

90 F.3d 910, 915 (5th Cir. 1996) (describing how Congress crafted § 1926(b) to address these issues). The District's position also is incompatible with the purpose of encouraging rural water development because expanding § 1926(b) to protect services unrelated to the qualifying federal loan would prohibit cities from providing other services to customers within a district's boundaries even when the city is perhaps better situated to do so, thereby forcing customers to remain with less desirable service providers. Turning to the second purpose, limiting the District's protection under the statute solely to the type of service being financed—sewer service in this instance—will not appreciably impact the security of the federal loan. The revenues from the District's sewer system secure the USDA loan; the District's water revenues are not collateral for the loan. The District's existing sewer customers and revenues remain protected under § 1926(b). In short, divorcing the type of service underlying a rural district's qualifying federal loan from the type of service that § 1926(b) protects would stretch the statute too far. Because we interpret "the service provided or made available" to be limited to the financed service, sewer service here, we affirm the grant of summary judgment to the City with respect to water customers within the District's boundaries.

C.

The District also challenges the City's provision of sewer service to customers at seven tracts of properties that the City did not begin serving until after the District closed on the USDA loan. This challenge represents a more typical § 1926(b) claim in that it involves both customers who were not served until after the District obtained the USDA loan and the same type of service financed by the loan. We thus apply the well-established test for determining whether a rural district is entitled to protection under § 1926(b). To qualify for protection, an entity must: (1) be an "association" under the statute, (2) have a qualifying federal loan, and (3) have provided or made service available to the disputed area. *See, e.g.*, *Sequoyah County*, 191 F.3d at 1197. With respect to the customers at these seven tracts, the first two requirements are not

in dispute. "Making service available has two components: (1) the physical ability to serve an area; and (2) the legal right to serve an area." *Sioux Center*, 202 F.3d at 1037. Because the district court granted the City's motion for summary judgment, we view the evidence concerning the District's physical abilities and legal rights in the light most favorable to the District. *See Irving v. Dormire*, 586 F.3d 645, 647 (8th Cir. 2009)

In 1998, the District amended its Decree of Incorporation to authorize providing sewer service in addition to the water service it was already providing. The District claims that, at that time, it began designing and constructing a wastewater treatment facility. However, the District did not secure an operating permit that would allow for discharge of wastewater from that facility until May 30, 2008. By then, the City had already begun serving all of the disputed customers, with the exception of those in one tract known as Castle Rock.

### 1.    Castle Rock

The City does not dispute that the District had the legal right to serve Castle Rock; rather, it challenges whether the District had the physical ability to serve these customers. Although the District had completed its wastewater treatment facility and obtained an operating permit for the facility at the time the City began serving Castle Rock, the District did not propose using this facility to provide service to customers at Castle Rock. Instead, the District proposed having Castle Rock's developer, Becky Burk, construct a new stand-alone treatment facility to serve those customers. This separate facility would treat wastewater using above-ground recirculating sand filters or biomedia filters. The District does not provide much detail about this proposal, though it appears that individual septic systems would also need to be installed at each house. Indeed, the parties dispute even basic objective facts, such as the visual impact the facility would have on the surrounding development. Nonetheless, the District's

expert averred that the facility, in whatever form it would take, would cost Burk approximately $360,000 and take approximately one year to construct.

Burk averred that the District's proposal of forcing her to build a stand-alone treatment facility was unacceptable. Burk intended Castle Rock to be an "upper-end" development, and she insisted that her customers would not tolerate the individual septic systems involved in the District's proposal. In fact, Burk claimed that she would not have developed Castle Rock had she known that the District's proposed method of providing sewer service would be forced on her. The district court accepted Burk's testimony and held that because the District's proposal would not "reasonably conform to the ideals and standards a developer or customer in a similar situation would expect," the District had not made service available within the meaning of § 1926(b). As a result, the district court granted the City's motion for summary judgment with respect to Castle Rock.

The district court misapplied the "made service available" test by improperly focusing on the preferences of the potential recipient of the service. The statute protects a rural district's service wherever it has been "made available," without restricting the methods of providing that service. The district court cited no authority for the proposition that courts should give dispositive effect to "the ideals and standards a developer or customer in a similar situation would expect." And we can find no support for that proposition either in the text of § 1926(b) or in the cases interpreting the statute. Although courts have recognized that a rural district's proposed method of providing service, if unreasonably costly or unreasonably delayed, can constitute a constructive denial of service, *see Rural Water District No. 1 v. City of Wilson*, 243 F.3d 1263, 1271 (10th Cir. 2001), allowing recipients' preferences to restrict the acceptable methods through which a rural district can

provide service would significantly dilute § 1926(b)'s protections.[10] We recognize that § 1926(b) can impose burdens on recipients, since granting rural districts an exclusive right to serve certain recipients also prevents recipients from choosing other service providers. This, however, is the choice Congress made in enacting the statute, and it is not the role of the courts to upset such policy decisions. *See Integrity Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 918-19 (8th Cir. 2008). Consistent with the statutory text, the proper inquiry is whether the District had "made service available." Typically, a rural district has discretion to determine the method of providing service, even if it conflicts with a potential recipient's stated preferences.[11] We therefore reverse the district court's ruling that the District's proposed method of providing service is insufficient under § 1926(b) because it does not conform to the "ideals and standards a reasonable developer or customer would expect."

We decline to decide, in the first instance, whether the District's skeletal proposal is sufficient to satisfy the "made service available" test for the purposes of surviving summary judgment. Under the "pipes in the ground" test used in water service cases, courts examine "whether a water association 'has adequate facilities within or adjacent to the area to provide service to the area within a reasonable amount of time after a request for service is made.'" *Sequoyah County*, 191 F.3d at 1202 (quoting *Bell Arthur*, 173 F.3d at 526). Here, the District argues that it has "adequate

---

[10]The district court correctly held that the reasonableness of imposing the $360,000 cost on the developer depends on disputed issues of fact, and is therefore unsuitable for resolution at the summary judgment stage.

[11]Of course, a rural district does not have unlimited discretion; a rural district has not "made service available" if the rural district's method of providing service amounts to a constructive denial of service. For instance, failing to provide a type of service that is generally accepted in the industry, failing to comply with state law requirements such as health and sanitation codes, or providing unreasonably costly or delayed service each might amount to such a constructive denial of service.

facilities" in place, despite the fact that its proposal involves no existing facilities. We have not found any cases where a rural district has satisfied the "physical ability to serve" requirement in the absence of any facilities whatsoever. *Cf. Lexington-S. Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 238 (6th Cir. 1996) ("[A]n association's ability to serve is predicated *on the existence of facilities* within or adjacent to a disputed property." (emphasis added)). However, given the lack of factual development about the District's current infrastructure or its physical ability to provide service to Castle Rock, we remand to the district court for further proceedings concerning whether the District had "made service available" to Castle Rock.

## 2. The Pre-Permit Customers

In its motion for partial summary judgment, the City only challenged the District's legal right to serve the remaining six tracts, not whether the District had the physical ability to serve these customers. The City argued, and the district court held, that because the District lacked an operating permit for its wastewater treatment facility, the District lacked the legal right to serve those tracts. The District argued that the lack of an operating permit did not prevent it from providing service, but only from discharging wastewater. The District presented alternative methods for temporarily dealing with the wastewater while the permit application was pending, including holding the wastewater until the District could obtain the necessary permit.

The District has taken a different position on appeal. In an effort to side-step the district court's adverse ruling, the District has abandoned its original proposal to provide service to these customers using its existing treatment facility. *See* Appellant's Br. at 45 ("The sewer facility . . . for which an [o]perating [p]ermit was obtained in May 2008[] is not the facility through which [the District] proposed to provide sewer service to the [d]isputed [c]ustomers."); *id.* at 48 ("[The District] did not propose to serve the [p]re-permit customers with these facilities.").

While it is not entirely clear what proposal the District seeks to substitute for its original plan, the District seems to suggest that it could provide service to these six tracts in a manner similar to its proposal for Castle Rock: forcing developers or customers to construct individual treatment facilities for the tracts of properties. Not only was this new proposal not meaningfully raised before the district court, but the record is almost entirely devoid of evidence regarding the factual details of the District's proposal to make service available, such as the expected cost and time required to build the facilities.[12] In response to the City's claim that the District is raising this proposal for the first time on appeal, the District has identified only one sentence in its motions before the district court that even arguably introduces the new proposal. *See* Reply Br. at 26-27 ("One of the ways [the District] has and can provide sewer service is for the developer to construct collection and treatment facilities utilizing recirculating sand filters or bio-media filters designed to meet the needs of the proposed development." (quoting Resp. to Mot. for Partial Summ. J. at 15, Dec. 31, 2008)).

The District's approach to this issue is precisely the type of sandbagging we have frequently criticized. Our well-established rule is that "[a]bsent exceptional circumstances, we cannot consider issues not raised in the district court." *Shanklin v. Fitzgerald*, 397 F.3d 596, 601 (8th Cir. 2005).

> The rationale for the rule is twofold. First, the record on appeal generally would not contain the findings necessary to an evaluation of the validity of an appellant's arguments. Second, there is an inherent injustice in

---

[12]In the same affidavit in which the District's expert estimated the cost and construction time for a stand-alone treatment facility to serve Castle Rock, the expert averred that a similar facility for Ostrich Lake, one of the remaining six tracts, would cost $160,000. Other than attaching the affidavit to its response to the City's motion for summary judgment, the District presented no meaningful argument regarding this new proposal to the district court. There is no evidence regarding facilities for the other five tracts.

> allowing an appellant to raise an issue for the first time on appeal. A litigant should not be surprised on appeal by a final decision there of issues upon which they had no opportunity to introduce evidence. A contrary rule could encourage a party to "sandbag" at the district court level, only then to play his "ace in the hole" before the appellate court.

*Von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 376 (8th Cir. 1997) (quoting *Stafford v. Ford Motor Co.*, 790 F.2d 702, 706 (8th Cir. 1986)). Both rationales are implicated here. The paucity of evidence regarding the nature, cost, and reasonableness of the District's newly proposed facilities for each development would frustrate our analysis of this proposal raised for the first time on appeal. Nor should the District be allowed to avoid the district court's adverse ruling by changing horses midstream. The District opposed the City's partial summary judgment motion focusing exclusively on whether the operating permit for its wastewater treatment facility was necessary to "make service available" and merely proposed temporary solutions for providing service until that permit was issued. Notwithstanding the one vague sentence noted above, the District's new proposal of constructing stand-alone facilities for each property was not meaningfully presented to the district court. "The district courts cannot be expected to consider matters that the parties have not expressly called to their attention, even when such matters arguably are within the scope of the issues that the parties have raised." *Stafford*, 790 F.2d at 706; *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). We therefore decline to entertain the District's new proposal. Having abandoned its previous proposal, the District is left with no support for its claim that it had made service available to the customers at these six tracts of properties. As a result, we affirm the district court's grant of summary judgment to the City with respect to those customers.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment with respect to all of the challenged customers other than those at Castle Rock. With respect to Castle Rock, we remand for consideration of whether the District had "made service available," without considering the recipient's preferred methods of receiving service.[13]

————————————————

[13]The District also argues that the district court erred in dismissing its state law claims without prejudice. The district court did so after finding that Missouri state courts have exclusive jurisdiction over these claims and, alternatively, that it was exercising its discretion to decline supplemental jurisdiction, in part because the state law issues were "novel and complex." *See* 28 U.S.C. § 1367(c)(1). The District states that it does not challenge the district court's alternative rationale. "We sit to review judgments, not opinions," so the District's disagreement with only one of two alternative reasons for the dismissal of its state law claims leaves us with no reason to decide the question. *See United States v. Dugan*, 912 F.2d 942, 944 (8th Cir. 1990). Because the District does not challenge the district court's discretionary decision not to exercise supplemental jurisdiction over the claims, we affirm the dismissal of these claims.